# In the United States Court of Federal Claims

No. 23-800C
(Filed:  June 25, 2024)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOSHUA J. ANGEL,

            Plaintiff,

    v.

THE UNITED STATES,

            Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Joshua J. Angel, New York, NY, for plaintiff.

Anthony F. Schiavetti, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

      In this suit, plaintiff Joshua J. Angel asserts his own claims and those of a putative class against the United States.[1]  His claims are founded on the dividend rights of shareholders of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or collectively, "the Enterprises."  Defendant, relying on Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), moves to dismiss his claims for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  As explained more fully below, the court grants defendant's motion to dismiss.

## I.  BACKGROUND

---

     [1]  Mr. Angel continues to propose himself as class counsel and class representative of the putative class, despite warnings from defendant that such a combination of roles constitutes an impermissible conflict of interest.  See Def.'s Mot. 14 n.3 (citing 1 Newberg and Rubenstein on Class Actions § 3:77 (6th ed. 2022)); Def.'s Mot. at 10 n.4, Angel v. United States, No. 22-867C (Fed. Cl. Jan. 17, 2023) (same); see also Kominers v. United States, 3 Cl. Ct. 684, 686 (1983) (refusing to certify class where the plaintiff was proposed as sole class representative and his law firm was proposed as class counsel).  This is just one example of Mr. Angel's questionable practice of ignoring relevant authority.

### A. Fannie Mae and Freddie Mac Shareholders Stop Receiving Dividends

Mr. Angel, like many other plaintiffs who filed claims in this court, seeks compensation for changes to the benefits of owning stock in Fannie Mae and Freddie Mac that occurred in the context of a government rescue of the Enterprises.[2]  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") addressed claims such as these in Fairholme Funds, Inc. v. United States, 26 F.4th 1274 (Fed. Cir. 2022), cert. denied, 143 S. Ct. 563, and cert. denied sub nom. Barrett v. United States, 143 S. Ct. 562, and cert. denied sub nom. Owl Creek Asia I, L.P. v. United States, 143 S. Ct. 563, and cert. denied sub nom. Cacciapalle v. United States, 143 S. Ct. 563 (2023).  As recounted by the Federal Circuit in that opinion:

> The Enterprises suffered devastating financial losses in 2008 when the national housing market collapsed.  In response, Congress enacted the Housing and Economic Recovery Act of 2008 (HERA).  HERA created the Federal Housing Finance Agency (FHFA), an independent agency tasked with regulating the Enterprises and (if necessary) stepping in as conservator or receiver.  12 U.S.C. §§ 4511, 4617.  HERA also contains a Succession Clause, which states that the FHFA "shall, as conservator or receiver . . . immediately succeed to [ ] all rights, titles, powers, and privileges of the [Enterprises], and of any stockholder . . . with respect to the [Enterprises] and the assets of the [Enterprises]."  Id. § 4617(b)(2)(A)(i).

> With the consent of the Enterprises' boards of directors, the FHFA's Director placed the Enterprises into conservatorship in September 2008.  The FHFA Director then negotiated preferred stock purchase agreements (PSPAs) with the Department of Treasury (Treasury) in which Treasury agreed to allow the Enterprises to draw up to $100 billion in capital in exchange for:  (1) senior preferred non-voting stock having quarterly fixed-rate dividends and an initial liquidation preference of $1 billion and (2) warrants to purchase up to 79.9% of the common stock of each Enterprise at a nominal price.

> FHFA and Treasury amended the terms of the original PSPAs in the years that followed. . . .  [The Third Amendment implemented] a "net worth sweep" under the PSPAs[, which] replaced the fixed-rate dividend formula with a variable one that required the Enterprises to make quarterly payments equal to their entire net worth, minus a small capital reserve amount.  The net worth sweep caused the Enterprises to transfer most, if not all, of their equity to Treasury, leaving no residual value that could be distributed to shareholders.[3]

---

[2]  The facts recounted in this section are derived from the complaint and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.

[3]  The term "shareholders," as used in this opinion, excludes Treasury.  See Compl. 2 n.1 (stating that the Enterprises "also issued preferred share securities to Treasury" but excluding Treasury as a member of the putative class of shareholders represented by Mr. Angel).

Id. at 1282-83 (alterations in first paragraph in original) (citations to appellate joint appendix omitted).  The Third Amendment to the PSPAs was adopted on August 17, 2012.  Compl. ¶ 10.

## B. Fannie Mae and Freddie Mac Shareholders File Numerous Suits

As noted by the Federal Circuit, "[s]hareholders launched a series of challenges to the net worth sweep that have worked their way through several fora, including the [United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit")] and the [United States] Supreme Court."  Fairholme, 26 F.4th at 1283.  In addition, "[p]arallel to these unsuccessful attempts to undo the net worth sweep, shareholders filed complaints with the [United States Court of Federal Claims ("Court of Federal Claims")]."  Id.  Many of the suits in this court were filed in 2013 or 2014, within six years of the Enterprises entering the conservatorships.  See, e.g., Wash. Fed. v. United States, 149 Fed. Cl. 281, 288, 297 (2020) (dismissing suit, filed in 2013, for compensation based on the conservatorships imposed by FHFA), aff'd, 26 F.4th 1253 (Fed. Cir. 2022); Cacciapalle v. United States, 148 Fed. Cl. 745, 759, 781 (2020) (dismissing suit, filed in 2013, for compensation based on the net worth sweep), aff'd sub nom. Fairholme, 26 F.4th at 1274.

A second wave of suits was filed when almost six years had passed since the net worth sweep was implemented.  See, e.g., Owl Creek Asia I, L.P. v. United States, 148 Fed. Cl. 614, 627, 646 (2020) (dismissing suit, filed in 2018, for compensation based on the net worth sweep), aff'd sub nom. Fairholme, 26 F.4th at 1274.  Some of the Enterprises' shareholders complained that share prices had plummeted after the net worth sweep was announced, and that the price for their shares would have been even lower without the market perception that the value of the shares might be restored by successful shareholder suits.  See, e.g., Compl. ¶ 104, Owl Creek Asia I, L.P. v. United States, No. 18-281C (Fed. Cl. Feb. 23, 2018) (alleging that there had been a "precipitous drop in the trading price of the Junior Preferred Stock in the over-the-counter market in the first two weeks alone following the enactment of the [Third] Amendment[, which] extinguished any existing market value for the Junior Preferred Stock by eliminating any possible investment return[, and contending that] [a]ny remaining trading value was necessarily attributable to the possibility that litigation success could result in a return on the Junior Preferred Stock").

In the appeals before it, the Federal Circuit ruled that shareholder claims based on the net worth sweep could not proceed in this court.  See Fairholme, 26 F.4th at 1282 (resolving eight appeals of decisions of this court in one opinion).  The Federal Circuit rejected constitutional claims for Fifth Amendment takings and illegal exactions, whether these claims were brought directly by the shareholders or derivatively on behalf of the Enterprises.  Id. at 1287-93, 1301-04.  All of these claims were barred for failure to state a claim upon which relief can be granted.  Id.  The Federal Circuit also rejected claims for breach of fiduciary duty, holding that neither FHFA nor Treasury owed a fiduciary duty to the Enterprises' shareholders, and affirming this court's dismissal of those claims on jurisdictional grounds.  Id. at 1296-99.

Finally, the Federal Circuit rejected two types of contract claims.  For those claims asserting a breach of an implied-in-fact contract with the shareholders, the shareholders failed to

state a claim upon which relief can be granted because the shareholders were not third-party beneficiaries of an implied-in-fact contract, even assuming, hypothetically, that such a contract had been formed between FHFA and the Enterprises.  Id. at 1293-94.  As for a claim asserting a breach of an express contract embodied in the shareholders' stock certificates, which was alleged to include a contractual right to dividends, the Federal Circuit stated that the shareholders lacked standing to assert such a claim because they were not in privity with the United States.  Id. at 1294-96.  It is beyond cavil that the holdings in Fairholme are binding on this court.

### C.  Mr. Angel Files His First Two Suits Related to His Fannie Mae and Freddie Mac Stock

In 2018, proceeding pro se, Mr. Angel filed suit in the United States District Court for the District of Columbia ("District Court") against FHFA, the Enterprises, and members of the boards of directors of the Enterprises, alleging that the Third Amendment was a breach of contract and a breach of the implied covenant of good faith and fair dealing.  See Angel v. Fed. Home Loan Mortg. Corp., No. CV 18-1142, 2019 WL 1060805, at *1-2 (D.D.C. Mar. 6, 2019) (noting that Mr. Angel brought claims for breach of contract, breach of the implied covenant, and tortious interference, but abandoned the third claim), aff'd, 815 F. App'x 566 (D.C. Cir. 2020).  The District Court dismissed Mr. Angel's claims related to the net worth sweep as untimely because they were barred under state law by statutes of limitation that require that suits be filed within either three or five years of the accrual of the claim.  Id. at *2-7.  The District Court then denied Mr. Angel's motion for leave to amend his complaint.  Angel v. Fed. Home Loan Mortg. Corp., No. CV 18-1142, 2019 WL 11320986, at *1 (D.D.C. May 24, 2019), aff'd, 815 F. App'x at 566.

The D.C. Circuit affirmed both of the District Court's decisions in a single, unpublished opinion.  See Angel, 815 F. App'x at 569-70 ("There are no other facts consistent with Angel's complaint that would make his claims, which accrued upon the adoption of the Third Amendment in 2012, timely.").  That decision issued on April 24, 2020.  That was not the end, however, of Mr. Angel's attempts to assert untimely contract claims founded on his ownership of shares in the Enterprises.

Less than two months later, again proceeding pro se, Mr. Angel filed suit in this court.  As in the District Court, he alleged that the implementation of the net worth sweep was a breach of contract and a breach of the implied covenant of good faith and fair dealing.  Compl. ¶¶ 10-17, 40, 50-51, 55, Angel v. United States, No. 20-737C (Fed. Cl. June 12, 2020).  On August 4, 2022, Mr. Angel, who was no longer proceeding pro se but as an attorney admitted to the bar of this court, voluntarily dismissed the action.

### D.  Mr. Angel Files Two Additional Suits Based on the Same Underlying Facts

Four days after that voluntary dismissal, Mr. Angel filed a second complaint in this court rehashing the same facts as his prior suits and modifying, slightly, his theories of recovery.  See generally Compl., Angel v. United States, No. 22-867C (Fed. Cl. Aug. 8, 2022).  The court dismissed that action on May 12, 2023, Angel v. United States ("Angel I"), 165 Fed. Cl. 453 (2023), and judgment was entered on May 15, 2023.  Mr. Angel declined to appeal this court's

adverse ruling to the Federal Circuit.

Instead, less than one month later, Mr. Angel filed the complaint in this matter, his third attempt at obtaining relief from this court based on his ownership of shares in the Enterprises. His claims for relief include "$22 billion in compensatory damages." Compl. 32. The claims asserted by Mr. Angel in the complaint are again, in large part, founded on his dividend rights, as a holder of Junior Preferred shares in Fannie Mae and Freddie Mac, and on the fact that no dividends were declared or paid to holders of Junior Preferred shares from January 1, 2013, to the date his complaint was filed, June 1, 2023. Id. ¶¶ 16-19. Mr. Angel represents that he "owns Junior Preferred Shares of both Fannie Mae and Freddie Mac, purchased after [the] Third Amendment enactment, in [an] amount in excess of $1 million face amount [sic]." Id. ¶ 46.

It is significant that Mr. Angel purchased his shares in the Enterprises after the Third Amendment, when, pursuant to the net worth sweep of the Enterprises' equity, the market value of those shares plunged, and the prospects for dividends being paid to the shareholders were, at best, grim. See Fairholme Funds, Inc. v. United States, 147 Fed. Cl. 1, 44 (2019) (stating that some shareholders who purchased shares after the Third Amendment "would acquire the stock at a price that reflects a discount for the property taken by the government and then [attempt to] obtain compensation from the government for the diminishment in value of their stock. That result is incompatible with the notion of just compensation that underlies the Fifth Amendment's Takings Clause"), aff'd in part, rev'd in part, 26 F.4th 1274 (Fed. Cir. 2022). His reference in the complaint to the "face amount" of the shares he owns, id. ¶ 46, implies that he paid less than that face amount in the weakened market for those shares. As the court noted in Angel I, shareholders who purchased shares in the Enterprises after the net worth sweep was implemented were speculating that litigation might restore value to those shares and produce a return on their investment. 165 Fed. Cl. at 457 n.2.

For shareholders of the Enterprises pursuing claims for compensation in this court, such a speculative stock purchase is problematic, for two reasons. First, in this court, a plaintiff cannot "buy a lawsuit" because, pursuant to the Anti-Assignment Act, claims against the United States are not transferrable in the marketplace. See, e.g., Shealey v. Wilkie, 946 F.3d 1294, 1298 (Fed. Cir. 2020) (stating that the Anti-Assignment Act, 31 U.S.C. § 3727, "generally prohibits the assignment of claims against the government unless the government has waived an objection to the assignment"). In this court, where the United States is the defendant, Mr. Angel's assertion that "causes of action[] transfer with the shares" in the Enterprises, Compl. 27 n.14, is incorrect.

Second, a purchase of shares after the Third Amendment dooms any claim founded on an implied guaranty of dividends, or a property interest in dividends, because these alleged benefits of owning shares in the Enterprises were belied by the market conditions that existed at the time the shares were purchased. In other words, claims for relief positing a breach of an implied-in-fact contract ensuring a guarantee of dividends, or a taking of the shareholder's property interest in receiving dividends, cannot lie. Although the complaint before the court is not a model of clarity, Mr. Angel references both an implied-in-fact contract, see Compl. ¶ 1 (alleging that the United States provided an "Implicit Guaranty of . . . contractually mandated quarterly dividend rights"), and a taking, see id. ¶ 13 (alleging a "Fifth Amendment taking, without payment of fair

consideration, for the approximately $22 billion of Junior Preferred share dividend entitlement"). Neither theory makes any sense for a shareholder who, like Mr. Angel, purchased his shares after the Third Amendment nullified the dividend rights he seeks to enforce in this suit.

### E.  Mr. Angel's Presentation of His Claims

Mr. Angel's claims are set forth in five counts.  In Count I, Mr. Angel alleges that the United States breached a contract, or contracts, with him on a quarterly basis, because his right to quarterly dividends was established by contract.  Id. ¶¶ 69-74.  In Count II, labeled "Illegal Extraction," Mr. Angel alleges that Treasury committed wrongful acts in conducting the net worth sweep, and/or the conservator for each of the Enterprises breached its fiduciary duty to the shareholders.  Id. ¶¶ 75-80.  In Count III, Mr. Angel, relying in part on bankruptcy law, seeks a declaratory judgment that his dividend rights must be retroactively restored at the end of the conservatorships of the Enterprises.  Id. ¶¶ 81-89.  In Count IV, Mr. Angel alleges that he had a settlement agreement with the United States to resolve the claims presented in the first suit he filed in this court, and that the United States breached that agreement.  Id. ¶¶ 90-95.  In Count V, Mr. Angel seeks a declaratory judgment that the United States committed to an "implicit guarantee" of his dividends from the Enterprises.  Id. ¶¶ 96-103.

### F.  Defendant's Motion to Dismiss

Defendant moved to dismiss the complaint on October 13, 2023.  The court stayed the government's motion to consider two intervening motions filed by Mr. Angel.  Once these motions were fully briefed, the court denied them.  See Angel v. United States ("Angel III"), 169 Fed. Cl. 552 (2024) (denying Mr. Angel's request to amend his complaint because the proposed amendment was futile); Angel v. United States ("Angel II"), 169 Fed. Cl. 224 (2024) (denying Mr. Angel's request to obtain discovery before responding to defendant's motion to dismiss because the proposed discovery was irrelevant to defendant's challenges to the claims in the complaint).  In consequence, the court lifted the stay of the briefing of defendant's motion to dismiss on February 21, 2024.

Defendant moves to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  Regarding Counts I, II, and V of the complaint, defendant contends that these claims are untimely and that they are barred by the doctrine of issue preclusion.  Addressing Count III, defendant argues that this claim sounds in bankruptcy law over which this court lacks jurisdiction, and also argues that the claim cannot proceed because this court does not have the power to provide prospective declaratory relief.  Concerning Count IV, defendant argues that there is no plausibility to Mr. Angel's claim that the United States entered into a settlement agreement with him.

In addition to those principal arguments, defendant presents other challenges to the claims in the complaint.  Defendant compares many of the claims that might be discerned in the complaint, such as claims for illegal exaction or breach of fiduciary duty, to claims rejected by the Federal Circuit in its Fairholme decision, and requests that the court follow that precedent. Defendant also contends that any contract claims asserted in Counts I, II, and V are implausible.

Finally, defendant argues that Mr. Angel's implied guarantee claim in Count V fails because it, like Count III, is a claim for declaratory relief that this court cannot provide.

The court reserves further discussion of the parties' arguments for the analysis section of this opinion, which proceeds count by count.  Briefing is now complete and neither party requested oral argument.  Defendant's motion to dismiss is thus ripe for resolution.

## II.  LEGAL STANDARD

### A.  RCFC 12(b)(1)

With respect to a motion to dismiss brought pursuant to RCFC 12(b)(1), the plaintiff bears the burden of establishing, by a preponderance of evidence, that the court possesses subject-matter jurisdiction over his claims.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  In determining whether subject-matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  Id.  However, the court is not limited to the pleadings in considering subject-matter jurisdiction.  Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Rocovich v. United States, 933 F.2d 991, 993-94 (Fed. Cir. 1991).  If the court finds that it lacks subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  RCFC 12(b)(6)

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief.  See Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  To survive an RCFC 12(b)(6) motion to dismiss, a plaintiff must include in his complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  In other words, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  Finally, although the court must "accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Twombly, 550 U.S. at 555-56), legal conclusions in the complaint are not presumed to be true, Iqbal, 556 U.S. at 678.

## III.  ANALYSIS

### A.  Count I

In Count I of his complaint, Mr. Angel alleges that breaches of contract occurred through "Treasury's quarterly actions preventing the [Enterprises'] board[s] of directors from complying with their obligations under the [shareholders' stock certificates] and [the government's] Implicit Guaranty [of the shareholders' quarterly dividend rights] . . . beginning January 1, 2013." Compl. ¶¶ 73-74.  As defendant notes, this claim is identical to Count I of the complaint dismissed by the court in <u>Angel I</u>, except for a slight revision to the amount of damages claimed.

## 1.  Timeliness

To come within the court's jurisdiction, a claim against the United States must be "filed within six years after such claim first accrues."  28 U.S.C. § 2501; <u>accord</u> <u>John R. Sand & Gravel Co. v. United States</u>, 552 U.S. 130, 133-35 (2008) (providing that the limitations period set forth in 28 U.S.C. § 2501 is an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a claim).  "A claim first accrues within the meaning of the statute of limitations 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'"  <u>Brown Park Ests.-Fairfield Dev. Co. v. United States</u>, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (quoting <u>Brighton Vill. Assocs. v. United States</u>, 52 F.3d 1056, 1060 (Fed. Cir. 1995)).  However, a "claim only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability."  <u>John R. Sand & Gravel Co. v. United States</u>, 457 F.3d 1345, 1356 (Fed. Cir. 2006), <u>aff'd</u>, 552 U.S. at 130; <u>see also</u> <u>Young v. United States,</u> 529 F.3d 1380, 1385 (Fed. Cir. 2008) ("It is a plaintiff's knowledge of the facts of the claim that determines the accrual date.").

Mr. Angel's claim in Count I for quarterly breaches of contract raises two separate and distinct timeliness questions.[4]  The first question is whether distinct claims that are alleged to have accrued one per quarter from January 1, 2013, to June 1, 2023, a ten-year period, can all be timely?  For hypothetical purposes only, quarterly claims that allegedly accrued each quarter from June 1, 2017, through June 1, 2023, could be timely, but earlier claims would necessarily be barred by this court's six-year statute of limitations.  Because there is no possibility that Mr. Angel's breach claims that rely on government actions alleged to have occurred before June 1, 2017, are timely, these claims must be dismissed.

The court issued a similar holding in <u>Angel I</u>.  <u>See</u> 165 Fed. Cl. at 463 (dismissing portion of breach claim founded on quarterly actions alleged to have occurred more than six

---

[4]  Mr. Angel alleges two sorts of quarterly contract breaches in Count I, one related to the declaration of dividends, the other related to the government's alleged guarantee that dividends would be paid to the Enterprises' shareholders.  <u>See</u> Pl.'s Resp. 1 (describing the first as "quarterly breaches of Junior Preferred Certificate of Designation ('COD') express contractual dividend rights" and the second as "quarterly breaches of the federal government Implicit Guaranty of Junior Preferred contractual dividend rights").  The court's accrual analysis applies to both types of breach of contract alleged by Mr. Angel in Count I of his complaint.  The court focuses more specifically on quarterly dividend declarations here, because that is Mr. Angel's focus in his response brief when he attempts to overcome defendant's statute of limitations challenge to Count I.  <u>Id.</u> at 15-21.

years before Mr. Angel filed suit in that case).  Mr. Angel does not address this key issue in his response brief, or offer any defense specific to the claims that, in his view, accrued from January 1, 2013 to June 1, 2017.  This is another example of Mr. Angel failing to address authority relevant to his current claims.  See supra note 1.

The second timeliness question focuses on claim accrual, where defendant contends that Mr. Angel's breach claim accrued no later than early 2013, whereas Mr. Angel argues that distinct breaches occurred every quarter since the net worth sweep was implemented, causing separate and distinct breach claims to accrue every quarter since early 2013.  See Pl.'s Resp. 16 (stating that the "Complaint alleges that each quarter, Treasury directed the respective [boards of directors] not to consider whether to declare dividends to Junior Preferred shareholders [and that each] such direction constituted a separate and distinct breach of contract").  This is not a new question; in Angel I, 165 Fed. Cl. at 463-66, the court held that Mr. Angel's breach claim, indistinguishable from that presented in Count I of the complaint here, accrued no later than early 2013, and that holding was reaffirmed in Angel II, 169 Fed. Cl. at 233.[5]  Rather than recapitulate in its entirety the accrual analysis that was presented Angel I, the court reproduces here two key holdings:  (1) "Once Mr. Angel knew or should have known of the damage to his dividend rights caused by the net worth sweep in early 2013, his claims accrued because he could have maintained a suit at that time."; and, (2) "Mr. Angel's claims do not benefit from the continuing claim doctrine because by early 2013 all of the elements of his claims had occurred and he could have filed suit."[6]  165 Fed. Cl. at 465-66.

The court has reviewed Mr. Angel's response brief to determine whether he has presented any new arguments, as opposed to those arguments the court has previously rejected, in support of his theory that distinct breach claims accrued quarterly and are timely.  Mr. Angel appears to have expanded one argument—that the net worth sweep was not fundamentally inconsistent with his dividend rights, so that the deprivation of dividends every quarter since 2013 was not foreseeable.  Pl.'s Resp. 16-21.  Mr. Angel asserts, for example, in the statement of the case section of his brief, that from 2013 forward, the Enterprises' "quarterly dividend determinations, possible dividend declarations and possible dividend deferrals were in no way inconsistent with the Third Amendment's Net Worth Sweep."  Id. at 5.  This is not accurate.

As the Federal Circuit explained in Fairholme, once the net worth sweep was instituted "no residual value . . . could be distributed to shareholders" of the Enterprises in the form of dividends.  26 F.4th at 1283.  Thus, any shareholder's contract claim based on the nonpayment of dividends, or the failure to conduct dividend determinations, accrued no later than early 2013

---

[5]  Mr. Angel's claims presented in his suit in the district court were also held to have accrued when the Third Amendment to the PSPAs inaugurated the net worth sweep, rather than quarterly within the applicable limitation periods.  Angel, 815 F. App'x at 569-70.

[6]  In the complaint dismissed by Angel I, Mr. Angel had not disclosed the fact that he purchased his shares in the Enterprises after the Third Amendment.  165 Fed. Cl. at 457 n.2.  For its analysis of claim accrual, the court need not determine whether, in early 2013, Mr. Angel, or someone else, owned the shares that he now owns.

when the payment of dividends to the Enterprises' shareholders was blocked by the net worth sweep.  Accord Angel, 815 F. App'x at 569 (rejecting Mr. Angel's argument that his contract claims accrued every quarter at the time of allegedly mandatory dividend determinations, where the Enterprises had no "surplus" that could be distributed in dividends).  Mr. Angel's contract claim related to dividends, however it is characterized, accrued no later than early 2013 when the shareholders could not and did not receive dividends from the Enterprises.

More generally, Mr. Angel returns to familiar territory with his arguments relying on the continuing claim doctrine and the "last requisite fact" test to support his quarterly claim accrual proposition.  Pl.'s Resp. 16-21; see also Angel I, 165 Fed. Cl. at 463-66 (rejecting Mr. Angel's contentions regarding quarterly claim accrual).  In his response brief, Mr. Angel concedes that early 2013 was the accrual date for one of his contract claims related to dividends.  See Pl.'s Resp. 18 (stating that "no Junior Preferred stock dividends have been even considered from January 2013 until the present date"), 19 ("A cause of action first arose in the first quarter after passage of the Third Amendment, when the [Enterprises' boards of directors], acting under Government direction, did not even consider making a Junior Preferred share dividend declaration[.]").  He then proceeds, however, to contest the court's accrual analysis in Angel I, asserting, once again, that separate claims for breach accrued each quarter, either through the "last act" test, or the continuing claim doctrine.[7]  Id. at 15-21.  Mr. Angel also attempts to distinguish the breach claims in this case from those found to be untimely in Angel I.  See id. at 19 (stating that "[t]he statement of facts as alleged in [this case] are [sic] distinguishable from those [asserted in the complaint at issue] in Angel I[]").

Despite Mr. Angel's protestations to the contrary, the guidance from the caselaw is the same, the facts are essentially the same, and his rehashing of the wording of the fact section of the complaint in this case does nothing to render his breach claim more timely than the one dismissed in Angel I.  The claim in Count I is not a continuing claim, because the net worth sweep was a single government action that had continuing effects in subsequent years.  See Brown Park, 127 F.3d at 1456 ("[A] claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."); see also Angel I, 165 Fed. Cl. at 463-66 (applying binding precedent delimiting the continuing claim doctrine).  Because Mr. Angel's breach claim accrued in early 2013 at the latest, it is untimely and must be dismissed for lack of subject-matter jurisdiction.

## 2.  Issue Preclusion

---

[7]  As defendant notes, Mr. Angel's current invocation of legal doctrines uses slightly altered terminology, or a mix of old and new labels, although the underlying concepts are the same as in his previous briefing of the statute of limitations issue.  See Def.'s Reply 4 (observing, for example, that Mr. Angel now substitutes the label "last act" for "last requisite fact"); see also Pl.'s Resp. 16, 21 (referring to both the "continuing claims doctrine" and "'continuing action' doctrine").  The court agrees with defendant that "merely using different names for [legal] doctrines" fails to add persuasiveness to Mr. Angel's arguments.  Def.'s Reply 4.

Courts apply preclusion principles to curb vexatious and repetitive litigation of the same issue in multiple lawsuits.  See, e.g., Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (stating that preclusion principles "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" (alterations in original) (quoting Montana v. United States, 440 U.S. 147, 153-54 (1979))).  Issue preclusion will bar a subsequent cause of action when:

> (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the plaintiff had a full and fair opportunity to litigate the issue in the first action.

Laguna Hermosa Corp. v. United States, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (quoting In re Freeman, 30 F.3d 1459, 1465 (Fed. Cir. 1994)); see also Whiteman v. Dep't of Transp., 688 F.3d 1336, 1340 (Fed. Cir. 2012) ("Collateral estoppel exists where:  '(i) the issue previously adjudicated is identical with that now presented, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action.'" (quoting Morgan v. Dep't of Energy, 424 F.3d 1271, 1274-75 (Fed. Cir. 2005))).  Jurisdictional rulings are given preclusive effect if these conditions are met.  See Amgen Inc. v. U.S. Int'l Trade Comm'n, 902 F.2d 1532, 1536 n.5 (Fed. Cir. 1990) ("Dismissals for lack of jurisdiction may be given res judicata effect as to the jurisdictional issue." (citing Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n, 455 U.S. 691, 706 (1981))); Askan Holdings, Ltd. v. United States, No. 21-1793C, 2022 WL 1512730, at *4 (Fed. Cl. May 12, 2022) (same), aff'd, No. 2022-1995, 2024 WL 747927 (Fed. Cir. Feb. 23, 2024).

One of the key differences between the doctrine of issue preclusion, and the doctrine of claim preclusion, is that the former doctrine does not require a ruling on the merits, but the latter doctrine does.  Compare Laguna Hermosa, 671 F.3d at 1288 ("Issue preclusion bars a cause of action when . . . 'resolution of the issue was essential to a final judgment in the first action[.]'" (quoting In re Freeman, 30 F.3d at 1465)), with Bowers Inv. Co. v. United States, 695 F.3d 1380, 1384 (Fed. Cir. 2012) ("Claim preclusion requires . . . a final judgment on the merits of the first suit[.]").  Because a dismissal for lack of jurisdiction prevents the court from reaching the merits of a claim, the correct doctrine to apply here is the doctrine of issue preclusion.  Accordingly, if the four conditions for issue preclusion are met, a previous court decision dismissing a claim for lack of subject-matter jurisdiction because it was untimely precludes this court from considering the timeliness issue again.  See Koopmann v. United States, No. 09-333T, 2020 WL 1844657, at *5 (Fed. Cl. Apr. 10, 2020) (holding that because a district court had already rejected the plaintiffs' tax refund claim as untimely, "this Court is precluded from allowing that issue to be relitigated in this case and has no choice but to grant the government's motion to dismiss the [plaintiffs' claim] for lack of subject-matter jurisdiction").

As previously noted in this opinion, the timeliness of the breach claim in Count I is the same issue that was decided in Angel I.  There is no difference between the accrual of the claim

in Count I here and the accrual of the claim in Count I of the prior suit.  Because the accrual issue here is identical to the one decided in Angel I, claim accrual was litigated in the prior suit, accrual was essential to the final judgment dismissing all of the claims in the prior suit as untimely, and Mr. Angel had a full and fair opportunity to litigate claim accrual in the prior suit, all four issue preclusion conditions are met and Count I of the complaint must again be dismissed as untimely.

Mr. Angel attempts to avoid this result, first, by pointing to the fact that the court's decision in Angel I resulted in the dismissal, without prejudice, of all of the claims in that suit. Pl.'s Resp. 15.  He asserts that the court, in doing so, "plainly invited the revised pleading now under consideration."  Id.  Especially advanced by an attorney of this court's bar, this is a remarkable interpretation of the court's dismissal of his claims in Angel I.

"Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  When the statute of limitations bars a claim and this court grants a motion to dismiss the claim for lack of subject-matter jurisdiction, the dismissal of that untimely claim is without prejudice.  E.g., Jackson-Greenly Farm, Inc. v. United States, 144 Fed. Cl. 610, 626 (2019), aff'd, 857 F. App'x 1021 (Fed. Cir. 2021).  There is no invitation in such a dismissal to re-file a stale claim in this court; indeed, it defies common sense to expect a stale claim, already rejected on timeliness grounds, to survive a motion to dismiss in a second suit filed at a later date. Accord Van Allen v. United States, No. 11-706C, 2012 WL 1437480, at *1-3 (Fed. Cl. Apr. 24, 2012) (dismissing, on issue preclusion grounds, the plaintiff's third suit in this court because the court had previously dismissed the plaintiff's claim as untimely).  Under the facts of this case, there is no cure for the statute of limitations defect—one cannot turn back the hands of the clock.

Next, Mr. Angel references two decisions that are binding on this court in support of his assertion that "a dismissal without prejudice has no preclusive effect on a new pleading."  Pl.'s Resp. 15.  Neither case is applicable to the preclusion standard applicable here, and the court need not consider the other case Mr. Angel proffers for his interpretation of the doctrine of issue preclusion.  The Federal Circuit opinion referenced by Mr. Angel focuses on claim preclusion, not issue preclusion, and states that "[d]ismissal without prejudice "indicates that judgment is not on the merits and will have no preclusive effect."  Jet, Inc. v. Sewage Aeration Sys., 223 F.3d 1360, 1364 (Fed. Cir. 2000) (emphasis added).  Here, the test for issue preclusion is whether "resolution of the issue was essential to a final judgment in the first action," Laguna Hermosa, 671 F.3d at 1288, not whether there was a final judgment on the merits in Angel I so as to support claim preclusion.

Turning to the Supreme Court decision referenced by Mr. Angel, it, too, is not applicable to the case at hand.  The question in that case was "whether the claim-preclusive effect of a federal judgment dismissing a diversity action on statute-of-limitations grounds is determined by the law of the State in which the federal court sits."  Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 499 (2001).  The district court action discussed in the opinion was a "with prejudice" dismissal, not a "without prejudice" dismissal.  Id.  If there is any guidance for this

court in <u>Semtek</u>, it would be for the question of when a court's "with prejudice" dismissal should be accorded claim-preclusive effect—an issue not before the court in the instant matter.

Pursuant to the doctrine of issue preclusion, Mr. Angel's breach claim in Count I must be dismissed as untimely because the accrual analysis in <u>Angel I</u> already decided that this claim was untimely when it was filed in 2022. It was even more remote in time when it was filed, again, in 2023.

### 3. Implausibility

In <u>Angel I</u>, this court considered whether a virtually identical Count I was plausible, and focused, in particular, on Mr. Angel's allegation that the United States had entered into an implied-in-fact contract to guarantee dividends to the Enterprises' shareholders. 165 Fed. Cl. at 467-68. According to Mr. Angel's complaint and briefing in that case, although these documents were unclear and difficult to decipher, the nature of the breach of the alleged implied-in-fact contract was quarterly interference from Treasury that prevented the Enterprises' boards of directors from making mandatory dividend determinations. <u>Id.</u> at 458-60. The court examined the factual allegations and legal theories in that prior complaint, the statutes governing Treasury officials, and Mr. Angel's clarifications of his claim, and concluded that any implicit guaranty of shareholder dividends by the United States was implausible:

> Although the court has accorded the factual allegations of the complaint all favorable inferences, Mr. Angel has not alleged facts that plausibly support the formation of an implied-in-fact contract between Treasury and shareholders of the Enterprises. No implicit guarantee of dividend rights is plausible, given the statutes governing Treasury officials and the absence of a meeting of the minds, and there is no allegation that supports a meeting of the minds as to Treasury's purported duty to not interfere in the declaration of dividends by the boards of the Enterprises. Because the government's offer to enter into an implied-in-fact contract must be "unambiguous," <u>Fairholme</u>, 26 F.4th at 1293, the breach-of-contract claim in Count I is not plausible and would necessarily be dismissed under RCFC 12(b)(6).

<u>Id.</u> at 468.

Fundamentally, the same analysis applies to Count I in this suit. Mr. Angel again focuses on an alleged implied-in-fact contract whereby the United States guaranteed the dividends of the shareholders. Compl. ¶ 73; <u>see</u> Pl.'s Resp. 24 ("[T]he implied-in-fact contract claim in [this case] can be stated simply as this: the United States Government, by its words and actions, implicitly guaranteed the express contract obligations to the holders of Fannie Mae and Freddie Mac non-cumulative Junior Preferred [certificates of determination] to make quarterly dividend determinations."). According to Mr. Angel, "the Government, starting with the first quarter after the Third Amendment, breached both the express contracts created by the [certificates of determination] and this Implicit Guaranty by preventing the Fannie Mae and Freddie Mac boards of directors from making the quarterly dividend determinations required by the [certificates of

determination]." Pl.'s Resp. 24. Mr. Angel asserts that his breach claim, based upon an implied-in-fact contract, is plausible:

> In light of the copious, well-pleaded allegations [in the complaint] of Implicit Guaranty statements by responsible Government officials, whether such contractual obligations existed is a fact question notwithstanding problematic statutory language that cannot be decided through the expedient of calling such a conclusion implausible.

Id. at 25.

In essence, then, Mr. Angel argues that the additional references to public statements in the current complaint should alter the court's prior plausibility analysis, so that what was implausible in Angel I is now plausible. See id. at 23 ("The [current] Complaint greatly augments the allegations regarding the government announcements of guarantee."). The court has reviewed the additional public statements quoted by Mr. Angel and finds that his factual allegations continue to fall far short of meeting the plausibility standard. Within these public statements, no authorized official of Treasury makes an unambiguous offer to guarantee that the shareholders of the Enterprises would receive dividends, or that Treasury would not impede quarterly dividend determinations by the Enterprises' boards of directors. Absent an unambiguous offer from the United States to enter into a contract, the breach claim in Count I that relies upon an implied-in-fact contract between the United States and Mr. Angel is implausible. In addition, as the court has previously explained, the alleged implied-in-fact contract upon which Mr. Angel relies, which is, at bottom, an implicit guaranty by the United States that the shareholders of the Enterprises would receive dividends, is especially implausible for a purchaser of shares who purchased those shares after the Third Amendment began the net worth sweep. See supra Section I.D. Because the breach claim in Count I of the complaint is not plausible, it would necessarily be dismissed under RCFC 12(b)(6) if it were within this court's subject-matter jurisdiction.

The court now addresses one other possible claim contained in Count I. Mr. Angel references an express contract between defendant and the Enterprises' shareholders, based on the certificates of determination for shares in the Enterprises, and suggests that this contract, too, has been breached. See supra note 4. In its motion to dismiss, defendant argues that such a breach claim is not plausible, because the Federal Circuit rejected claims alleging that a contract was formed between the United States and the shareholders:

> [T]he contracts on which Mr. Angel relies—the [certificates of determination]—are contracts between Enterprise shareholders and the Enterprises themselves. See, e.g., Compl. ¶¶ 3, 70; Cacciapalle v. United States, 148 Fed. Cl. 745, 779-80 (2020), aff'd sub nom. Fairholme Funds, Inc. v. United States, 26 F.4th 1274 (Fed. Cir. 2022) (finding that Enterprises' stock certificates are contracts between shareholders and Enterprises, and that plaintiffs failed to demonstrate privity with the United States). Indeed, the Federal Circuit has already determined that the stock certificates are not contracts with the United States. See Fairholme, 26

-14-

F.4th at 1293-96. Shareholders are neither in privity with the United States via their stock certificates, id. at 1295-96, nor are they third party beneficiaries of any implied contract between FHFA and the Enterprises, id. at 1294.

Def.'s Mot. 28. Defendant's interpretation of binding precedent is correct and unrebutted. Indeed, Mr. Angel's response brief does not address the plausibility of a breach claim founded on an express contract between the United States and the Enterprises' shareholders. To the extent that Count I could be read to include a breach claim based on an express contract with the United States, it, too, is implausible and must be dismissed.[8]

For all of the above reasons, the court dismisses Count I pursuant to RCFC 12(b)(1), or, in the alternative, under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

## B. Count II

In Count II of the complaint, labeled "Illegal Extraction," Mr. Angel alleges that Treasury committed wrongful acts in conducting the net worth sweep, and/or the conservator for each of the Enterprises breached its fiduciary duty to the shareholders. Compl. ¶¶ 75-80. This is the same claim, very lightly revised, as former Count III of Mr. Angel's 2022 complaint—labeled "Quarterly Wrongful Acts in Conducting Conservatorship[s]"—that the court dismissed in Angel I as untimely. 165 Fed. Cl. at 461, 463-66. One change in the wording of these virtually identical counts is that the damage estimate has increased from $20 billion to $22 billion. Compare Compl. ¶ 79, with Compl. ¶ 56, Angel v. United States, No. 22-867C (Fed. Cl. Aug. 8, 2022). The only other change in the respective counts is in the text of the sentence providing a description of the consequences of Treasury's "wrongful acts." The description in the prior complaint read: "In effecting these quarterly unauthorized sweeps, Treasury rendered the $33 billion of [the Enterprises'] Junior Preferred shares principal outstanding incapable of payment breach restoration without Defendant's eschew of statute of limitations and agreement to make whole interest payment at conservatorship end, and thus mandatory in damages payment in connection with this action." Compl. ¶ 57, Angel v. United States, No. 22-867C (Fed. Cl. Aug. 8, 2022) (emphasis added to show language that would be revised). The sentence has been

---

[8] As the court reads the complaint and Mr. Angel's response brief, Mr. Angel unconvincingly attempts to merge an alleged express contract between the Enterprises and their shareholders that concerns quarterly dividend determinations into an alleged implied-in-fact contract between the United States and the Enterprises' shareholders that concerns an implicit guarantee of dividends. See Compl. ¶¶ 1-2, 59, 69-73; Pl.'s Resp. 1-2, 16-17, 24. It is not necessary to find the logic in Mr. Angel's curious blending of contract types. Mr. Angel focuses on the plausibility of an implied-in-fact contract in his response brief, and the court has done the same. See Pl.'s Resp. 23 ("The question is whether Plaintiff alleged sufficient facts from which it can be concluded that the alleged implied-in-fact contract is plausible."). Nonetheless, the court considers any and all of the contract formation allegations that might be discerned in Count I to be implausible.

revised in the current complaint to read:  "In effecting these quarterly unauthorized sweeps, Treasury rendered the $33 billion of [the Enterprises'] Junior Preferred shares <u>permanently impaired, making Defendant responsible to effect sums which it illegally extracted within six (6) years of complaint filing payable with interest t [sic] in connection with this action</u>."  Compl. ¶ 80 (emphasis added to show revised text).

### 1.  Timeliness

Defendant argues that the wrongful acts claim in Count II, as far as the accrual analysis is concerned, is indistinguishable from the virtually identical claim dismissed in <u>Angel I</u>.  The court agrees.  Mr. Angel's wrongful acts claim, which clearly focused (and, in the current complaint, continues to focus) on quarterly payments, or "sweeps," to Treasury from the Enterprises, <u>id.</u> ¶ 80, accrued when the net worth sweep began, no later than early 2013.  The court so held in <u>Angel I</u>, 165 Fed. Cl. at 463-66, and that holding was reaffirmed in <u>Angel II</u>, 169 Fed. Cl. at 233, and <u>Angel III</u>, 169 Fed. Cl. at 556-57.  Rather than recapitulate in its entirety the accrual analysis that was presented in <u>Angel I</u>, the court reproduces and reaffirms two key holdings:  (1) "Once Mr. Angel knew or should have known of the damage to his dividend rights caused by the net worth sweep in early 2013, his claims accrued because he could have maintained a suit at that time."; and, (2) "Mr. Angel's claims do not benefit from the continuing claim doctrine because by early 2013 all of the elements of his claims had occurred and he could have filed suit."  165 Fed. Cl. at 465-66.

The court has reviewed Mr. Angel's response brief to determine whether he has presented any new arguments, as opposed to those arguments the court has previously rejected, in support of his theory that distinct wrongful acts claims accrued quarterly and are timely.  There is only one new argument, and it is not persuasive.

Mr. Angel now describes the wrongful acts claim as including a component related to the recovery by FHFA of litigation proceeds in the name of the Enterprises.  Pl.'s Resp. 9-12.  He asserts that the "transfer" of these litigation proceeds from the Enterprises to Treasury in the net worth sweep was a "wrongful extraction."  <u>Id.</u> at 10-12.  Mr. Angel also alleges that the Enterprises began to receive these litigation proceeds in "late 2013/2014."  <u>Id.</u> at 10.

As the court noted in <u>Angel III</u>, however, because Mr. filed this suit on June 1, 2023, any claim for the extraction of litigation proceeds, which is not a continuing claim, is untimely because it accrued more than six years before he filed it.[9]  169 Fed. Cl. at 556-57.  Thus, the

---

[9]  Although the court does not agree with Mr. Angel that litigation proceeds must be distinguished from funds from other sources that were paid to Treasury by the Enterprises in the net worth sweep, <u>Angel III</u>, 169 Fed. Cl. at 556-57, the "wrongful extraction" of litigation proceeds alleged by Mr. Angel in his response brief began more than six years before he filed the complaint, Pl.'s Resp. 10-12.  Even if a portion of his claim in Count II related to litigation proceeds could be considered to be separate and distinct from his more general attack on the quarterly payments made by the Enterprises to Treasury, it, too, would be untimely.

court cannot agree with Mr. Angel that "Plaintiff has thus stated a factual basis for the Government's wrongful extraction of $12 billion of . . . litigation proceeds within the limitations period." Pl.'s Resp. 11-12. Mr. Angel's other timeliness arguments regarding the continuing claim doctrine and the last requisite fact test, which were rejected in Angel I and were also rejected in relation to Count I, are similarly unpersuasive as to Count II. See supra Section III.A.1; cf. Pl.'s Resp. 21 (urging the court to apply the statute of limitations analysis he provided for Count I also "to the . . . Count Two Illegal Exactions claims"). The court finds that Mr. Angel's wrongful acts claim in Count II is untimely because it accrued in early 2013 at the latest.

### 2. Issue Preclusion

Mr. Angel's only argument against issue preclusion, the purported lack of preclusive effect of the dismissal of a claim without prejudice, was discussed, and rejected, in relation to the breach claim in Count I. See supra Section III.A.2. The dismissal without prejudice of the wrongful acts claim in his second lawsuit before this court was not an invitation for him to refile a claim in 2023 that was already untimely in 2022. Id. Further, the binding precedent Mr. Angel relied upon was inapposite to the Federal Circuit's test for issue preclusion. Id.

Here, once again, the timeliness of the wrongful acts claim in Count II is the same issue that was decided in Angel I. There is no difference between the accrual of the claim in Count II here and the accrual of the claim in former Count III of the prior suit. Because the accrual issue here is identical to the one decided in Angel I, claim accrual was litigated in the prior suit, accrual was essential to the final judgment dismissing all of the claims in the prior suit as untimely, and Mr. Angel had a full and fair opportunity to litigate claim accrual in the prior suit, all four issue preclusion conditions are met and Count II of the complaint must be dismissed as untimely. Laguna Hermosa, 671 F.3d at 1288. Pursuant to the doctrine of issue preclusion, Mr. Angel's wrongful acts claim in Count II must be dismissed as untimely because the accrual analysis in Angel I already decided that this claim was untimely when it was filed in 2022.

### 3. Implausibility

In Angel I, this court considered whether any claim in former Count III of that complaint, virtually identical to Count II here, was plausible, and concluded that any claim that could be discerned in that count was not plausible. 165 Fed. Cl. at 469-70. Most important to the arguments now raised by Mr. Angel in his response brief, the court held that any illegal exaction claim asserted by Mr. Angel was foreclosed by the Federal Circuit's Fairholme decision. Id. at 470. Mr. Angel argues that his illegal exaction claim differs from the one rejected in Fairholme:

> [T]he Fairholme plaintiffs were challenging the legality of the Third Amendment and its Net Worth Sweep and asserting that the Net Worth Sweep itself constituted the wrongful exaction. That's why the Federal Circuit held in Fairholme that the wrongful exaction claims based on the Net Worth Sweep belong[ed] to the Enterprises. 26 F.4th at 1291-92. In [this suit], Plaintiff is not challenging the legality of the Third Amendment and its Net Worth Sweep or asserting that the Net Worth Sweep constituted the wrongful exactions. Instead,

the Plaintiff . . . is asserting that all Junior Preferred Shareholders have a contract right to quarterly dividend determinations and the Government's quarterly actions preventing the Fannie Mae and Freddie Mac's boards of directors from making dividend determinations were the wrongful Government actions.  In [this case], unlike <u>Fairholme</u>, the wrongful exaction took away a contract right/property interest that belonged to the Plaintiff.

Pl.'s Resp. 26-27 (adding underlining to the term <u>Fairholme</u> where missing).

There are several flaws in Mr. Angel's arguments concerning his illegal exaction claim. First, Mr. Angel confuses Federal Circuit guidance regarding a takings claim with quite different guidance regarding an illegal exaction claim.  The elements necessary to satisfy these differing claims are distinct, not identical, as Mr. Angel implies.  In <u>Angel I</u>, the court referenced the "wrongful exaction" language used by the Federal Circuit to describe an illegal exaction claim in a case that presented both that claim and a takings claim.  165 Fed. Cl. at 470 (citing <u>Longshore v. United States</u>, 77 F.3d 440, 441 (Fed. Cir. 1996)).  Mr. Angel distills from <u>Longshore</u> his proposed definition of an illegal exaction claim but quotes, inexplicably, the portion of that decision that defines a takings claim, not an illegal exaction claim.  <u>See</u> Pl.'s Resp. 25 (asserting that in <u>Longshore</u> "the Federal Circuit stated that the 'definitive issue' in a wrongful exaction case is 'whether appellant had a property interest that was taken from him by government action'" (quoting <u>Longshore</u>, 77 F.3d at 443)).  In <u>Longshore</u>, the Federal Circuit actually stated: "The definitive issue with respect to appellant's <u>takings claim</u>, however, is whether appellant had a property interest that was taken from him by government action."  77 F.3d at 443 (emphasis added).

The court declines the invitation, presented in Mr. Angel's response brief, to conflate takings claims with illegal exaction claims.  Equally unhelpful, Mr. Angel also juxtaposes these terms in the complaint with little apparent regard for coherence, clarity, or precedent when attempting to define Count II.  <u>See</u> Compl. ¶ 13 (characterizing the basis for Count II as FHFA causing the Enterprises to "illegally extract in Fifth Amendment taking, without payment of fair consideration, for the approximately $22 billion of Junior Preferred share dividend entitlement, to Senior Preferred in Treasury unjust self-enrichment"), ¶ 19 (describing Count II as an "illegal exaction quarterly taking").  The court is unsure whether Mr. Angel's confusion of these terms is inadvertent or intentional.

An illegal exaction claim is distinguishable from a takings claim in that it seeks the return of monies paid to the government.  <u>See</u> <u>Aerolineas Argentinas v. United States</u>, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) ("[A]n illegal exaction claim may be maintained when 'the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" (quoting <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1007 (Ct. Cl. 1967))).  Mr. Angel's argument that his contract right to quarterly dividend determinations was taken from him, <u>see</u> Pl.'s Resp. 25-26 ("Each quarter after the Third Amendment, that contract right/property interest [to dividend determinations] was taken from [the shareholders] by Government actions – wrongful Government exactions."), cannot support

an illegal exaction claim.  Simply put, Mr. Angel asks the court to apply the wrong legal standard in its review of his illegal exaction claim.[10]

Second, Fairholme bars illegal exaction claims brought by the Enterprises' shareholders in two ways.  Illegal exaction claims related to the payments made to Treasury during the net worth sweep were derivative claims that belonged to the Enterprises, not the shareholders. Fairholme, 26 F.4th at 1287-92.  In addition, no statute was contravened by the net worth sweep, so no illegal exaction claim would lie.  See id. at 1293 (stating that "FHFA was authorized to adopt the net worth sweep").  As the court commented in Angel I, Mr. Angel's illegal exaction claim is barred by Fairholme and is also implausible because he has not alleged that his illegal exaction claim is for money that he paid to Treasury.  165 Fed. Cl. at 470 & n.7.

Third, it is possible that Mr. Angel's illegal exaction claim is, in essence, a mislabeled takings claim.  See Compl. ¶ 19 (referencing this claim as an "illegal exaction quarterly taking"), ¶ 49 (describing Mr. Angel's claims as "emanat[ing] from Treasury Agency['s] unauthorized taking"), ¶ 77 ("HERA did not . . . eliminate the contract rights of private owners."); Pl.'s Resp. 11 (defining the claim in Count II as including "Treasury's periodically takings [sic] of . . . litigation proceeds in Net Worth Sweeps").  The Federal Circuit, however, held that the Enterprises' shareholders could not bring takings claims against the United States, because any takings claim would belong to the Enterprises.  Fairholme, 26 F.4th at 1287-92.

Even if the takings claim possibly asserted by Mr. Angel were not barred by Fairholme, a "takings claim cannot be found[ed] on the theory that the United States has taken unlawful action."  Moody v. United States, 931 F.3d 1136, 1143 (Fed. Cir. 2019).  In other words, the "claimant must concede the validity of the government action which is the basis of the taking claim."  Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993).  Mr. Angel makes no such concession in Count II of the complaint.

In addition, if Mr. Angel asserts a takings claim in Count II, it is also implausible because he purchased his shares after the Third Amendment impaired the dividend rights of the Enterprises' shareholders.  To assert a property right to dividends, only shareholders who purchased their shares before the Third Amendment conceivably had such a right.  See Reoforce, Inc. v. United States, 853 F.3d 1249, 1263 (Fed. Cir. 2017) ("It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001))).  Mr. Angel is not a shareholder in this category.

Thus, if Count II contains a takings claim, that claim is implausible because it is barred by binding precedent.

_____

[10]  The court provided Mr. Angel with the Federal Circuit's precedential definition of an illegal exaction claim in Angel I.  See 165 Fed. Cl. at 470 (citing Aerolineas Argentinas, 77 F.3d at 1572-73).  Here, again, he has ignored relevant authority.  See supra note 1.

Finally, the court turns to the component of Count II of the complaint which focuses solely on the alleged illegal extraction of litigation proceeds. In Mr. Angel's view, the wrongful or illegal act was "Defendant having treated the [litigation proceeds] as if they were profits that were subject to being transferred to Treasury each quarter pursuant to the Quarterly Net Worth Sweep." Pl.'s Resp. 27. Mr. Angel avers that "litigations [sic] proceeds are not profits" and that "[p]rofits come from operations, not litigation." Id. at 10. What is lacking to support such an assertion is an identified source of law. Mr. Angel vaguely references "GAAP" and "false accounting," id., but utterly fails to explain how his "illegal extraction" claim falls within this court's jurisdictional mandate. And, although in his earlier suit Mr. Angel disavowed that his wrongful acts claim was a tort claim, Angel I, 165 Fed. Cl. at 461, his claim for the wrongful extraction of litigation proceeds appears to be nothing more than a tort claim that this court cannot entertain. Cf. 28 U.S.C. § 1491 (excluding from this court's jurisdiction cases "sounding in tort"). To the extent that Count II includes a claim for the illegal extraction of litigation proceeds from the Enterprises, such a claim does not satisfy the plausibility requirement to avoid dismissal under RCFC 12(b)(6).

For all of the above reasons, the court dismisses Count II pursuant to RCFC 12(b)(1), or, in the alternative, under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

## C. Count III

Count III of the complaint bears the cryptic title "§ 1124 Declaratory Relief Re: Impairment Mandatory Redemption." Compl. 28. Apparently this claim seeks to enforce certain contract rights of the shareholders, such as their rights to dividends. See id. ¶ 88 (stating that the law "require[s] that termination of the conservatorship[s] must include Fannie Mae and Fredie Mac's belated effectuation of the Junior Preferred's dividend rights so that the conservatorship does not result in a nonconsensual impairment of the Junior Preferred's contract rights and there are no statute of limitations constraints in determining whether the conservatorship's meets [sic] that requirement" (citing 11 U.S.C. §§ 109, 1124)). The claim relies on sections 108, 109, and 1124 of Title 11 of the United States Code. Id. at 13, 29. It also relies on broad statements of the law as to the duties of a conservator: "A conservator's duty is to operate, rehabilitate, and restore the financial health of the troubled institution." Id. ¶ 85. A final distinguishing feature of this claim is that it seeks declaratory relief. Id. at 28, 32; see Pl.'s Resp. 1-2 ("Plaintiff also seeks relief in the form of declaratory findings regarding . . . permanent impairment of Junior Preferred share value by reason of government actions, rendering the shares mandatorily redeemable at conservatorship and/or case end.").

Defendant argues in its motion to dismiss, first, that this court lacks jurisdiction over claims arising under the bankruptcy law provisions of Title 11 of the United States Code. See Def.'s Mot. 25-26 (citing Blodgett v. United States, 146 Fed. Cl. 104, 108 (2018), aff'd, 792 F. App'x 921 (Fed. Cir. 2019)). Mr. Angel did not respond to this argument. The court agrees that in Count III Mr. Angel attempts to assert his rights under bankruptcy law; such a claim is not within the court's jurisdiction. Accord Blodgett, 146 Fed. Cl. at 108 ("[D]istrict courts shall have original and exclusive jurisdiction over all cases arising under Title 11." (citing 28 U.S.C.

§§ 151, 1334)).  Thus, Count III, founded on Title 11 of the United States Code, must be dismissed for lack of subject-matter jurisdiction.

Defendant also argues, persuasively, that Count III cannot be entertained by this court because it is a request for declaratory relief.  Mr. Angel did not respond to this argument.  As the court advised him in Angel II, this court does not have the power to grant declaratory relief except in limited circumstances.  As a general rule,

> awards of prospective declaratory relief are beyond this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a).  See Brown v. United States, 105 F.3d 621, 624 (Fed. Cir. 1997) ("The Tucker Act does not provide independent jurisdiction over such claims for equitable relief." (citing United States v. King, 395 U.S. 1, 2-3 (1969))).

Angel II, 169 Fed. Cl. at 234.

None of the limited exceptions to the general rule applies in this case.  See, e.g., Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 191-92 (2013) (noting that in bid protests, tax cases, Contract Disputes Act cases, and federal pay cases before this court, declaratory relief may be available).  In addition, this is not a case where declaratory relief is subordinate to a money judgment, and thus permissible as a means to effectuate a money judgment, because Mr. Angel has no monetary claims that can withstand defendant's motion to dismiss.  See, e.g., James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998) ("[T]he Court of Federal Claims has no power 'to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment.'" (quoting Austin v. United States, 206 Ct. Cl. 719, 723 (1975))); McKuhn v. United States, No. 18-107C, 2018 WL 2126909, at *3 (Fed. Cl. May 9, 2018) (denying requests for equitable relief because the plaintiff was "not entitled to any monetary relief that would allow this court to entertain any of the equitable remedies the plaintiff [wa]s seeking"); Walker v. United States, 117 Fed. Cl. 304, 324 (after holding that the plaintiff's monetary claims were untimely, dismissing the plaintiff's claims for equitable relief because "this court cannot grant equitable relief unless incident or collateral to a monetary judgment"), aff'd, 587 F. App'x 651 (Fed. Cir. 2014).  Because Count III is a request for declaratory relief, it must be dismissed on jurisdictional grounds for this reason as well.

For the above reasons, the court dismisses Count III pursuant to RCFC 12(b)(1) for lack of subject-matter jurisdiction.

### D.  Count IV

In Count IV of the complaint, Mr. Angel asserts that the United States breached a settlement agreement that allegedly resolved the claims in his first suit before this court.  See Compl. 2 (referencing an alleged "2022 agreement to settle Angel v. United States[,] No. 20-737C").  According to Mr. Angel, he extended his offer of settlement, in the form of a "preliminary draft Settlement Agreement," on June 10, 2021, "the words and conduct of Defendant's agents from June 2021 to January 2022 constituted an acceptance," and defendant

breached the settlement agreement by means of an e-mail sent on March 16, 2022. Compl. ¶¶ 39, 92-93, 95. Mr. Angel voluntarily dismissed that earlier suit on August 4, 2022.

In its motion to dismiss, defendant argues that Mr. Angel's claim for breach of a settlement agreement is implausible. Defendant notes that Mr. Angel has not proffered a document signed by both parties, nor has he identified a government official with the requisite authority who signed such a document, or who authorized the settlement. Defendant urges the court to dismiss Count IV for failure to state a claim upon which relief can be granted. Defendant's position—that no settlement agreement was reached with Mr. Angel—has been presented, consistently and emphatically, in a multitude of filings with the court. See, e.g, Jt. Status Rep. at 4, Angel v. United States, No. 20-737C (Fed. Cl. Mar. 24, 2022); Def.'s Reply Br. at 3, Angel v. United States, Case No. 22-867C (Fed. Cl. Oct. 6, 2022).

### 1. Mr. Angel's Settlement Narrative

Mr. Angel argues that the alleged settlement agreement was executed and that it was breached. In his complaint, Mr. Angel alleges that contract formation occurred in this manner:

> Plaintiff's settlement proposal delivered to the Defendant on June 10, 2021 constituted an offer. . . . Under general contract law principles, the words and conduct of Defendant's agents from June 2021 to January 2022 constituted an acceptance, i.e., "manifestation of assent to the terms thereof," resulting in the formation of a contract as provided in Restatement (Second) of Contracts section 171(1).

Compl. ¶¶ 92-93. Although Mr. Angel does not appear to have pointed to the correct provision of the Restatement (Second) of Contracts, he apparently relies on the Restatement to support his conclusion that the United States accepted his settlement offer.[11] Mr. Angel asserts that "Defendant's email of March 16, 2022, was not a refusal to accept an offer that had already been accepted, but rather a breach of an existing contract which gives rise to Plaintiff's right to damages for breach of contract." Id. ¶ 95.

The allegations of fact and law in Mr. Angel's response brief appear to be an expanded version of the more succinct allegations of contract formation and breach set forth in Count IV of his complaint. Mr. Angel begins his defense of the plausibility of the alleged settlement agreement with the following statement:

---

[11] Section 171 of the Restatement bears the title "When Reliance on an Assertion of Intention Is Not Justified," and subsection one states that "[t]o the extent that an assertion is one of intention only, the recipient is not justified in relying on it if in the circumstances a misrepresentation of intention is consistent with reasonable standards of dealing." The language quoted by Mr. Angel appears, instead, in subsection one of Section 50 of the Restatement, which bears the title "Acceptance of Offer Defined; Acceptance by Performance; Acceptance by Promise"; this provision states that "[a]cceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer."

> During June and July 2021 the parties exchanged a series of emails and telephone calls culminating on July 20, 2021[,] when the Government's then lead counsel advised Plaintiff that:  (a) the Government had agreed in principle to the June 10th draft Settlement Agreement [proffered by Mr. Angel] as it contained all of the material terms of the proposed settlement and;  (b) that the government had authorized its counsel to submit the Settlement Agreement for formal finalization, and Court filing on July 22, 2021.

Pl.'s Resp. 12.  Mr. Angel further asserts that "[o]n or about July 21, 2021," with his consent, defendant proposed that the court stay the filing deadline for the parties' joint status report in Case No. 20-737C.  Id.  Mr. Angel argues, however, that he "was given no reason to believe that Defendant's request for an extension of the filing date [of the settlement agreement] was in any way connected to, or resulted from a change in the Government's position that the parties had reached an agreement in principle on track for ministerial formalization."  Id.

Mr. Angel contends that even "through close of business March 15, 2022, Plaintiff was provided no basis to question his firm belief in an unconditional and mutually binding . . . Settlement Agreement that was on track for ministerial formalization, to be included as an attachment to the joint status report . . . to be filed with the Court on March 24, 2022" in that case.  Id. at 13.  He further states that he advised counsel for the United States on January 20, 2022, that he had attached to his communications with them that day a "proposed, revised" settlement agreement, a draft stipulation of dismissal, and instructions for the wire transfer of attorney fees to his bank account, for the purposes of "pre-Joint Status Report filing."  Id.  Mr. Angel notes that "[t]here were no further communications from Defendant to Plaintiff regarding the . . . Settlement Agreement until, on March 16, 2022, eight days short of the then-agreed-to . . . date for Settlement Agreement filing, Defendant, without stating a factual or legal basis, informed Plaintiff by email" that the United States "will not be accepting [his] settlement offer, nor entering any stipulations at this time."  Id.  Finally, Mr. Angel states that the "Parties then agreed to the March 24, 2022 Joint Status Report filing with separate statements of Plaintiff/Defendant positions regarding the . . . Settlement Agreement."  Id. at 14.

According to Mr. Angel,

> Neither the March 22, 2022 [sic] email nor any further contemporaneous communication from the Defendant nor any pleading filed by the Defendant expressly deny the factual allegations in the . . . Complaint that the . . . Settlement Agreement had been approved in principle by an appropriate Government official.

Id.  He further avers that:

> Counsel for the United States represented to Plaintiff that the . . . Settlement Agreement had been approved in principle, by the necessary Government officials, with formalization, a ministerial act to follow.  The dispute was resolved.  Plaintiff proceeded on that basis.

Id. at 28.  In prior proceedings before this court, Mr. Angel asserted that the breach of contract occurred when former counsel for defendant was replaced with current counsel:

> Internal shifting of Defendant lead counsel, in March 16, 2022 [email's] surprising 'confirmation from appropriate authorities – of non-interest[ed] [sic] in further settlement discussion at this time,' does not erase case history of Settlement Agreement accord prior to March 16, 2022.

Pl.'s Br. at 7 n.6, Angel v. United States, Case No. 22-867C (Fed. Cl. Sept. 29, 2022) (second alteration in original).  After reviewing the docket of Mr. Angel's three suits before this court, however, the court has not identified a single filing where the United States mentioned settlement negotiations with Mr. Angel.

Mr. Angel concludes his arguments with the proposition that Count IV cannot be dismissed because the facts alleged in the complaint "must be accepted as true":

> Plaintiff has properly alleged facts that the United States represented to him that the . . . Settlement Agreement was agreed to by the responsible Government officials.  These facts, for pleading purposes, must be accepted as true.  And, accepting these facts as true, a contract existed.  The identity of the responsible Government officials will be disclosed during discovery and become part of the factual record on a decision on the merits.  For purposes of the Government's present motion, Plaintiff has alleged adequately the existence of a contract of settlement.

Pl.'s Resp. 28.

### 2.  Mr. Angel's Settlement Narrative Is Implausible

The court now conducts its own analysis of the plausibility of the alleged settlement agreement that is the foundation for the breach claim in Count IV of Mr. Angel's complaint.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  Further, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Id.  To establish that a contract with the United States was formed, Mr. Angel must allege facts plausibly suggesting "(1) mutuality of intent to contract; (2) consideration; . . . (3) unambiguous offer and acceptance[; and] (4) the government representative whose conduct is relied upon [had] actual authority to bind the government in contract."  Fairholme, 26 F.4th at 1293-94.

Mr. Angel argues, in essence, that former counsel for defendant settled his earlier case and that current counsel for defendant breached that settlement agreement.  There are at least three glaring flaws that make Count IV implausible.  First, "judicial experience and common sense," Iqbal, 556 U.S. at 679, are insurmountable barriers to the plausibility of Mr. Angel's

settlement narrative.  Second, the trial attorney alleged to have manifested "assent," Compl. ¶ 93, to Mr. Angel's settlement offer did not have settlement authority.  Third, the facts alleged by Mr. Angel show that former counsel for defendant did not intend for his comments about the proposed settlement agreement, whatever these comments are purported to have been, to create binding obligations on the part of the United States.  The court will address these topics in turn.

### a. Judicial Experience and Common Sense

Mr. Angel's settlement narrative is procedurally and substantively implausible.  Turning first to the procedural implausibility of that settlement narrative, Mr. Angel's representations are fundamentally inconsistent with the procedures followed by the United States Department of Justice ("Department of Justice") before this court, in at least three ways.

First, there are several procedural steps that must occur before the Department of Justice can settle a class action suit, and all of these steps are missing from Mr. Angel's narrative and, tellingly, from the docket of Case No. 737C.  Pursuant to RCFC 23(c)(1), the court would have issued a certification order defining the class.[12]  Pursuant to RCFC 23(g), the court would have appointed class counsel.  Pursuant to RCFC 23(c)(2), the court would have directed that notice of the opt-in class action be provided to members of the defined class.  Pursuant to RCFC 23(e), the court would have approved of all aspects of the settlement tentatively achieved by the parties.  For a class action settlement such as the one Mr. Angel alleges, the court would have held a fairness hearing to determine whether he, as the sole class representative, "adequately represented the class," and whether the class was treated "equitably relative to each other." RCFC 23(e)(2)(A), (D).  Mr. Angel's settlement narrative is procedurally implausible because none of these requirements was fulfilled when the United States is alleged to have entered into a settlement agreement with him, for an amount that could only be justified by a robust class membership.  See Compl. at 15, Angel v. United States, No. 20-737C (Fed. Cl. June 12, 2020) (seeking $16 billion in damages).

Second, if an attorney for the United States enters into settlement negotiations with a plaintiff's attorney and an agreement is reached, there is a paper trail, possessed by both parties, of the negotiations and the approval, by the appropriate official with adequate authority, of the proposed settlement.  Mr. Angel has presented not a shred of documentary evidence to support his allegations regarding settlement negotiations and approval.  That lack of documentation demonstrates that Mr. Angel's settlement narrative is procedurally implausible.

---

[12]  Mr. Angel's class action settlement narrative is also implausible because no other plaintiffs have been identified and, as a consequence, no damages could be calculated.  See Compl. ¶ 63 (stating that the "exact number of Class members is currently unknown") (emphasis added), ¶ 67 (stating that "[c]lass members' individual damages are believed to be relatively small") (emphasis added).  Without a specific damages amount, no settlement could be achieved. Cf. Haggart v. United States, 131 Fed. Cl. 628, 635 (2017) (noting that the settlement agreement achieved by the parties in that case included an attachment specifying the "amount to be paid for each individual claim of the Settling Plaintiffs").

Third, trial attorneys at the Department of Justice do not settle cases, they recommend tentative settlements to their superiors. Former counsel for the United States who is alleged by Mr. Angel to have bound the United States in a settlement agreement, Mr. Eric Laufgraben, was not unaware of this procedure. In fact, at about the time Mr. Laufgraben is alleged to have been settling Case No. 737C, he explained to another judge of this court that settlement authorization occurs above his level at the Department of Justice:

> [T]he parties have made substantial progress toward a potential settlement of this case. Additional time is needed to permit the parties to continue discussions and negotiate terms of a potential settlement agreement. And if the parties reach an agreement, counsel for the United States will require sufficient time to seek approval of the settlement from the Attorney General or his delegate.

Def.'s Consent Mot. at 1, Husky Envelope Prods., Inc. v. United States, No. 20-160C (Fed. Cl. Aug. 13, 2020). Mr. Angel's factual allegations concerning a settlement agreement he purportedly reached with Mr. Laufgraben are procedurally implausible given the specific context of the Department of Justice's settlement process.

Mr. Angel's settlement narrative is substantively implausible, as well. By the time Mr. Angel filed his first suit in this court, which was assigned to the undersigned judge, the government had already prevailed in each case presenting similar, direct shareholder claims, in rulings by the undersigned judge. Those rulings were ultimately affirmed by the Federal Circuit in February 2022, in its Fairholme decision, at the time when Mr. Angel alleges that the United States had settled his class action claims for $16 billion, and that a purely ministerial formalization of the settlement agreement was about to occur.

In the court's experience, the Department of Justice would not settle claims of this magnitude when dismissal of Mr. Angel's claims was compelled by binding precedent. By the time Mr. Angel filed his first suit in this court, the D.C. Circuit had already held that his contract claims accrued when the Third Amendment was enacted, not every quarter thereafter. As the government pointed out in its motion to dismiss Mr. Angel's first suit, his claims were untimely because they were filed more than six years after they accrued. Def.'s Mot. at 11-14, Angel v. United States, No. 20-737C (Fed. Cl. Aug. 18, 2020).

The court must also ask: Would the Department of Justice settle untimely claims that were indistinguishable from claims on which the government had already prevailed before the trial court—rulings the Department of Justice was currently defending in appeals before the Federal Circuit? The answer is no, because there is no plausible motive to do so. Mr. Angel's allegations regarding a finalized settlement agreement with the United States are substantively implausible, and, indeed, fantastic. Cf. Rohland v. United States, 136 Fed. Cl. 55, 67 (2018) (dismissing a "facially fantastic" breach claim because "[a] person simply cannot, as plaintiff has attempted, unilaterally impose a 'settlement agreement' (or any type of contract) on another party"). Count IV must be dismissed under RCFC 12(b)(6) because, as a matter of judicial experience and common sense, the settlement agreement narrative provided by Mr. Angel is implausible.

### b. Actual Authority

Mr. Angel alleges that he contracted with the government, through the actions of government counsel, to settle his first case before this court. He therefore took "the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). Assuming, for the purposes of the plausibility analysis, that "the words and conduct of Defendant's agents from June 2021 to January 2022," Compl. ¶ 93, communicated to Mr. Angel that his settlement offer had been accepted, the question is whether government counsel had the authority to accept Mr. Angel's settlement offer.

Mr. Laufgraben, or current counsel for defendant, for that matter, does not have actual authority to settle claims brought before this court.[13] See Def.'s Mot. 32 ("Settlement authority is delegated by Federal regulation to specified senior officials within the Department of Justice."); see also Dorego v. Sec'y of Health & Hum. Servs., No. 14-337V, 2016 WL 1635826, at *2 n.2 (Fed. Cl. Spec. Mstr. Apr. 4, 2016) (stating that "trial attorneys from the Department of Justice cannot contractually bind the United States [because] [t]his authority is reserved to supervising officials within the Department of Justice" (citing Tompkins v. United States, 117 Fed. Cl. 713, 722 (2014))). Mr. Angel does not address the authority issue, other than to state that "on July 20, 2021[,] . . . the Government's then lead counsel advised Plaintiff that . . . the Government had agreed in principle to the June 10th draft Settlement Agreement," and that the "Settlement Agreement had been approved in principle, by the necessary Government officials, with formalization, a ministerial act[,] to follow." Pl.'s Resp. 12, 28. According all favorable inferences to the facts alleged by Mr. Angel, the communications he allegedly received regarding an approved settlement were made by a person lacking the authority to bind the United States, and these alleged facts do not carry his burden under RCFC 12(b)(6) to support either contract formation or his breach claim.

---

[13] "Actual authority may be express or implied." Liberty Ammunition, Inc. v. United States, 835 F.3d 1388, 1402 (Fed. Cir. 2016). The attorney representing the United States in Mr. Angel's first suit lacked express actual settlement authority, because that authority was not delegated to him, and lacked implied actual settlement authority because authorizing settlements was not integral to his job functions. See id. (holding that implied actual authority to enter an agreement binding the United States exists only when that authority is an integral part of the government employee's duties, or, in other words, "when the government employee could not perform his or her assigned tasks without such authority" (quoting Flexfab, LLC v. United States, 62 Fed. Cl. 139, 148 (2004), aff'd, 424 F.3d 1254 (Fed. Cir. 2005))).

In a recent decision, the Federal Circuit found that a supervisor at the United States Mint was plausibly alleged to have implied actual authority to contract to accept and redeem mutilated coins, when some of those coins were alleged to have been melted down and used by government, because such contracting authority was plausibly an "integral part" of his duties. Portland Mint v. United States, 102 F.4th 1371, 1384 (Fed. Cir. 2024). Here, however, Mr. Laufgraben could not settle claims against the United States, and it is not plausible that contracting authority to settle claims was an integral part of his duties as a trial attorney.

Defendant compares Mr. Angel's allegations to those raised by a pro se plaintiff, a Mexican national, who proffered vague details of communications with agents of the United States that allegedly included a promise that he would be paid $84 million for confidential informant services.  Sahagun-Pelayo v. United States, No. 13-929C, 2014 WL 3643471, at *1-5 (Fed. Cl. July 22, 2014), aff'd, 602 F. App'x 822 (Fed. Cir. 2015).  The government argued in its motion to dismiss in that case that none of these agents possessed authority to bind the United States in contract.  Id. at *4.  The plaintiff, Mr. Sahagun-Pelayo, then offered in his response brief "an entirely new factual allegation in an apparent attempt to cure the defect in his complaint."  Id.  He stated that an unnamed government official from Washington, DC, who he understood to have contracting authority, met with him in El Paso, Texas.  Id.

The court found that Mr. Sahagun-Pelayo's claim for breach of contract, even if the complaint were viewed as amended to include his new factual allegation, was implausible.  The court noted that the vague communications alluded to by Mr. Sahagun-Pelayo did "not provide sufficient facts to plausibly suggest that any government employee had implied or express actual authority to enter into a contract with" him.  Id. at *5.  The court noted, among other flaws, that Mr. Sahagun-Pelayo had not alleged that a written agreement had been signed by any of the government representatives.  Id.  Finally, the court noted that "even if the complaint or [the] plaintiff's response brief could somehow be read to include a statement asserting the actual authority of any of the federal employees who [we]re alleged to have contracted with Mr. Sahagun-Pelayo, such a bare statement would be a mere legal conclusion which would not be entitled to the favorable inferences of a factual allegation."  Id. (citing Twombly, 550 U.S. at 555).  The Federal Circuit "agree[d] with the Court of Federal Claims that Sahagun-Pelayo failed to state a claim for breach of an implied-in-fact contract."  Sahagun-Pelayo v. United States, 602 F. App'x at 826.

Here, too, the allegations in Mr. Angel's complaint as to an approved settlement are vague, and no approving official at the Department of Justice is identified by name or position.  See Compl. ¶ 93 (stating that "the words and conduct of Defendant's agents from June 2021 to January 2022 constituted an acceptance" of Mr. Angel's settlement offer).  Here, too, like Mr. Sahagun-Pelayo, Mr. Angel does not allege, either in his complaint or his response brief, that the purported settlement agreement was signed by a representative of the United States.  See Pl.'s Resp. 28 (stating that although the alleged settlement agreement "had been approved in principle, . . . formalization, a ministerial act[, was] to follow").  Here, too, any allegations as to actual authority on the part of the approving authority are mere legal conclusions unsupported by factual allegations.  See id. (referring, without specificity, to settlement approval by the "responsible Government official, whoever he or she was" or by the "necessary Government officials"); see also id. at 14 (stating, inaccurately, that the complaint contained factual allegations that the purported settlement agreement "had been approved in principle by an appropriate Government official").  The settlement agreement allegations presented by Mr. Angel here are no more plausible than the contract formation allegations presented by Mr. Sahagun-Pelayo to this court.

Mr. Angel has no plausible settlement agreement because he has not plausibly alleged that the agreement was approved by a government representative with actual settlement

authority; Count IV must therefore be dismissed under RCFC 12(b)(6).  See, e.g., Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1327 (Fed. Cir. 1997) (affirming the dismissal of a contract claim where the plaintiff had not alleged "facts sufficient to show that the Government representative who entered into its alleged implied-in-fact contract [had express or implied actual authority] to bind the Government"); Jordan v. United States, 77 Fed. Cl. 565, 570 (2007) (dismissing tax claim because the plaintiff's negotiations were with an IRS employee lacking the actual authority to bind the United States and settle the tax liability in dispute); Coastal Int'l Sec., Inc., DOTCAB No. 4528, 06-2 B.C.A. (CCH) ¶ 33385 (Aug. 24, 2006) (refusing to enforce a settlement agreement because conversations between counsel, absent an approval of the proposed settlement by an official with actual settlement authority, were insufficient to create a binding settlement agreement); Appeal of J.H. Strain & Sons, Inc., ASBCA No. 34432, 88-3 B.C.A. (CCH) ¶ 20909 (June 7, 1988) (refusing to enforce a settlement agreement where the attorney negotiating for the government did not possess express or implied actual authority to settle the litigation).

### c.  Assent/Intent to Contract

The court now considers whether any of the communications allegedly received by Mr. Angel from counsel at the Department of Justice plausibly assented to the settlement agreement Mr. Angel proposed, or expressed the intent of the United States to enter into a contract.  See, e.g., Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380-81 (Fed. Cir. 2019) (requiring both mutuality of intent to contract and lack of ambiguity in acceptance for a contract to be formed with the United States).  Mr. Angel proffers no documentary evidence of acceptance or assent.  In his complaint, Mr. Angel identifies his settlement offer as one sent on June 10, 2021, and generally alludes to communications from "Defendant's agents from June 2021 to January 2022" as the acceptance of his settlement offer.  Compl. ¶ 93.  Elsewhere in the complaint, Mr. Angel alleges that "[i]n or around January 2022, the parties finalized" the settlement agreement. Id. ¶ 42.  Defendant points out, in its motion to dismiss, that an "'objective manifestation of voluntary, mutual assent[]' . . . is required to establish the existence of a contract."  Def.'s Mot. 31-32 (quoting Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003)).  Defendant argues that the "vague allegation [in the complaint] falls far short of plausibly alleging an unambiguous acceptance of Mr. Angel's alleged settlement offer, or of any intent on the part of the United States to enter into a contract with Mr. Angel."  Id. at 32.

Mr. Angel expands on his settlement agreement allegations in his response brief, and therein contends that there was "a series of emails and telephone calls [that] culminat[ed] on July 20, 2021[,] when the Government's then lead counsel advised Plaintiff that . . . the Government had agreed in principle to the June 10th draft Settlement Agreement."  Pl.'s Resp. 12.  Mr. Angel argues, further, that he was told that the agreement in principle would be followed by "formal finalization," or, in other words, that it was "on track for ministerial formalization."  Id. According to Mr. Angel, his claims in that first suit were "resolved," he "proceeded on that basis," and he "has properly alleged facts that the United States represented to him that the . . . Settlement Agreement was agreed to by the responsible Government officials."  Id. at 28.

The assent Mr. Angel alleges he received from government counsel is not plausible. First, although Mr. Laufgraben could have personally agreed with a proposed settlement offer from Mr. Angel, at least in theory, he could not plausibly have intended that his communications with Mr. Angel would bind the United States in contract prior to approval of the proposed settlement by someone at the Department of Justice with settlement authority.  See supra Sections III.D.2.a-b.  "In the absence of contractual intent . . . , no contractual obligations arise." Mod. Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992).  None of the facts alleged by Mr. Angel shows that a representative of the United States had the intent to enter into the proposed settlement agreement.

Second, in the context of settling cases before this court, the achievement of an agreement in principle has a procedural meaning, i.e., that the parties are on track to achieve a settlement, but it does not mean that they have entered into a settlement agreement.  See, e.g., Mercier v. United States, 156 Fed. Cl. 580, 583 (2021) (canceling a trial date based on the parties' report that they had achieved an agreement in principle, but noting that the settlement agreement was not executed, and the disputed claims were not resolved, until six months later); Spahn v. Sec'y of Health & Hum. Servs., No. 09-386V, 2014 WL 12721080, at *7 (Fed. Cl. Spec. Mstr. Sept. 11, 2014) (pausing litigation after the respondent reported that an agreement in principle had been reached by the parties, but resuming litigation once "the authorized representatives of the Attorney General . . . declined to grant settlement authority for the proposed tentative settlement"), review denied and cause remanded, 133 Fed. Cl. 588 (2017); Travelers Cas. & Sur. of Am. v. United States, 74 Fed. Cl. 75, 77 & n.1 (2006) (recounting the parties' achievement of an agreement in principle to settle two consolidated cases, and the execution of settlement agreements a few months later in those cases).  Indeed, in Spahn, the reviewing court held that the agreement in principle between the parties was merely "tentative" and "preliminary" and could not be enforced by the special master against the government. Spahn, 133 Fed. Cl. at 604-05.  Any communication by government counsel to Mr. Angel that the parties had achieved an agreement in principle, if true, would only establish that the government had entered into settlement negotiations, not that the United States had entered into a settlement agreement.

Third, Mr. Angel's factual allegations include a "final formalization" step that clearly contemplates a settlement process culminating in a written settlement agreement signed by both parties.  Pl.'s Resp. 12.  Indeed, in his complaint Mr. Angel references a draft settlement agreement that was provided by him and attached to the parties' status report filed in his first case on March 24, 2022.  Compl. ¶ 42.  He signed that document but there is no signature by a representative of the United States.  Jt. Status Rep. Ex. 1 at 23-24, Angel v. United States, No. 20-737C (Fed. Cl. Mar. 24, 2022).  In general, when a formal written settlement agreement is contemplated by the parties participating in settlement negotiations, no settlement agreement occurs until the agreement has been signed by both parties.  See Am. Gen. Leasing, Inc. v. United States, 587 F.2d 54, 58 (Ct. Cl. 1978) (holding that where "the parties envisioned a formal writing as the only document which could establish a binding contractual relationship between them," an alleged verbal agreement was insufficient to bind the United States); see also Attestor Value Master Fund v. Republic of Argentina, 940 F.3d 825, 832 (2d Cir. 2019) (affirming dismissal of a claim based on an alleged settlement agreement, because settlements

are typically written, not oral, and settlement agreements signed by only one party are not binding); Skycom Corp. v. Telstar Corp., 813 F.2d 810, 815 (7th Cir. 1987) ("As a rule, 'agreements in principle' that refer to subsequent "formal agreements" are not binding."); R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) ("With [tens of millions of dollars] at stake, a requirement that the [contractual] agreement be in writing and signed simply cannot be a surprise to anyone."); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 263 (2d Cir. 1984) ("Since the parties intended not to be bound prior to execution of those written documents and since none was ever executed, no contract came into existence."); Appeal of Marino Constr. Co., VABCA No. 2752, 90-1 B.C.A. (CCH) ¶ 22553 (Dec. 14, 1989) (finding it "significant" that the draft settlement agreement alleged to have bound the United States had a blank signature block for the person with settlement authority, and declining to enforce the alleged settlement agreement).  Where Mr. Angel proffered a draft written settlement agreement to counsel for the United States as a means for settling claims that he valued at $16 billion, it is implausible that the United States accepted that offer with anything less than a fully-executed written settlement agreement.

Finally, the court notes that Mr. Angel references two draft settlement agreements, one communicated to defendant on June 10, 2021, and another sent to former and current counsel for the United States on January 20, 2022.  Compare Compl. ¶ 39 (mentioning "a preliminary draft Settlement Agreement, dated June 10, 2021, delivered to Defendant counsel for client review"), with id. ¶ 42 (mentioning a "January 2022 Agreement, which was attached [to a] Joint Status report to the Court, March 24, 2022," that was unsigned by any representative of the United States), with Pl.'s Resp. 13 (stating that the revised draft settlement agreement was sent by Mr. Angel on January 20, 2022).  Mr. Angel describes the second draft settlement agreement, sent to counsel for the United States on January 20, 2022, in this manner:  "Plaintiff's proposed, revised 'Stipulation and Agreement of Settlement' . . . for attachment to the Joint Status Report . . . to be filed with the Court on or before 2022."  Pl.'s Resp. 13 (emphasis added).  That there were two versions of the draft agreement sent by Mr. Angel to defendant, according to the factual allegations Mr. Angel has presented to this court, raises questions as to how, and when, the United States might have accepted Mr. Angel's settlement offer.

In the complaint, Mr. Angel alleges that the settlement agreement was finalized in January 2022.  Compl. ¶ 42.  In his response brief, Mr. Angel asserts that he received assent to the settlement agreement on July 20, 2021.  Pl.'s Resp. 12.  Perhaps Mr. Angel is alleging that he received more than one assent to more than one draft settlement agreement.  See Compl. ¶ 93 (stating that "the words and conduct of Defendant's agents from June 2021 to January 2022 constituted an acceptance, i.e., 'manifestation of assent to the terms thereof,' resulting in the formation of a contract").  The court will address the plausibility of both alleged assents to Mr. Angel's settlement offers.

Because Mr. Angel sent to counsel for the United States a revised settlement draft in early 2022, the alleged acceptance by the United States of an earlier draft could not have been effective.  See Winston v. Mediafare Ent. Corp., 777 F.2d 78, 82-83 (2d Cir. 1985) ("Where, as here, counsel insist on continually redrafting the specific terms of a proposed agreement, the changes made must be deemed important enough to the parties to have delayed final execution

and consummation of the agreement.").  In other words, Mr. Angel's factual allegations show that his written settlement offer changed, in January 2022, and that settlement negotiations, if any, had not yet culminated in a settlement agreement.  See Hilton Hotels Corp. v. United States, No. 95-516C, 1996 WL 34587858, at *3-4 (Fed. Cl. Jan. 22, 1996) (finding that settlement negotiations had not concluded in an agreement, because the plaintiff sent two draft written settlement agreements to the United States for signature after an oral settlement agreement was alleged to have bound the United States).  Any alleged acceptance by the United States of a first draft settlement offer on July 20, 2021, is implausible.

Focusing now on the alleged assent by the United States to the terms of the January 2022 revised draft settlement agreement that might have occurred in early 2022, the court notes that Mr. Angel has represented that the offer he extended to the United States, in the revised version of the draft settlement agreement that he signed, was in written form.  Pl.'s Resp. 13.  The act of soliciting an assent by offering a draft settlement agreement, signed by the offering party, shows that the offering party considers previous negotiations to be preliminary until the other party to the litigation also signs the agreement:

> The most convincing evidence that the telephon[ic settlement] conference was not a final settlement of [the] plaintiff's case, and that a written settlement document signed by both parties was required, was the fact that on August 1, 1989, (seven days after the conference was held) the Navy's attorney Jacobson prepared such a written settlement agreement, signed it, and sent it to the plaintiff for her consideration and signature.  She refused to sign it. . . .  The writing of the Navy's proposed settlement agreement by Jacobson is significant because it indicates that the Navy, like the plaintiff, did not consider the telephone conference a final settlement of [the] plaintiff's case.

Mahboob v. Dep't of Navy, 928 F.2d 1126, 1129 (Fed. Cir. 1991).

Here, Mr. Angel alleges that the United States refused to sign his draft settlement agreement.  Compl. ¶¶ 42, 45; Pl.'s Resp. 12-14, 28.  Further, the terms of the draft settlement agreement created by Mr. Angel and submitted by the parties to the court state that the settlement would not be effective until it was "fully executed," and that it could not be amended or modified except by a writing signed by all parties.  Jt. Status Rep. Ex. 1 at 14, 21, Angel v. United States, No. 20-737C (Fed. Cl. Mar. 24, 2022).  When a draft written settlement agreement states that it is not effective until signed by both parties, or that it cannot be modified except by a fully-executed writing, such a requirement generally means that no agreement exists between the parties until the written settlement agreement is fully executed.  See Ciaramella v. Reader's Dig. Ass'n, Inc., 131 F.3d 320, 326 (2d Cir. 1997) (finding no settlement agreement where the draft settlement agreement exchanged between the parties, by its own terms, would not be effective until signed by the parties); Wang Lab'ys, Inc. v. Applied Comput. Scis., Inc., 958 F.2d 355, 359 (Fed. Cir. 1992) (refusing to enforce an unsigned draft settlement agreement that included a provision that it could only be amended or modified by "a signed writing executed by authorized representatives of all parties").  Thus, according all favorable inferences to the facts alleged by

Mr. Angel, there was no plausible acceptance of Mr. Angel's settlement offer by the United States, and no plausible settlement agreement between Mr. Angel and the United States.

Count IV must be dismissed for failure to state a claim upon which relief can be granted, not just for the reasons previously identified by the court in Sections III.D.2.a-b, but also because neither assent nor mutuality of intent to contract is plausible given the facts alleged by Mr. Angel. See, e.g., Turping v. United States, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (affirming the dismissal of a contract claim under RCFC 12(b)(6) because the plaintiffs had "not met their burden of proving that mutuality of intent [to contract] between the Government" and the plaintiffs existed).

For all of the above reasons, the court dismisses Count IV pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

## E. Count V

Mr. Angel presents a claim in Count V of his complaint that is founded, like Count I, on an implicit guarantee by the United States of shareholder dividends. The court agrees with defendant's comment that this claim "appears to reiterate the contract law theory stated in Count I, alleging an implied-in-fact contract arising from an implied Government guarantee of Enterprise shareholder dividend rights." Def.'s Mot. 15. Defendant contends that this claim is untimely, that it is barred by the doctrine of issue preclusion, that it requests relief that is not within the court's powers, and that it is implausible.

Count V is characterized by three salient features. First, it is a claim for declaratory relief. Compl. 30, 32. Second, Mr. Angel indicates that the declaratory relief requested concerns a "Federal Government Guaranty of Timely Payment for Junior Preferred Share Legal Obligations." Id. at 30-31. Third, it appears to rely on Mr. Angel's repetitive filing of complaints in this court to establish that the claim is timely:

> Commencing with the filing of this complaint, Treasury has sixty (60) days in which to settle, answer, or move in regard thereto. . . . Based upon Treasury's responses to prior complaints, declaratory relief with regard to this Count is timely.

Id. ¶¶ 102-03. The only mention of Count V in Mr. Angel's response brief is this cryptic summary of the claim: "Plaintiff also seeks relief in the form of declaratory findings regarding . . . the federal government guaranty of timely payment of the Companies' Junior Preferred equity securities co-extensive, and on par with that of their debt securities legal obligations . . . ." Pl.'s Resp. 1-2. The court now addresses defendant's four challenges to this claim.

### 1. Timeliness

At the outset, the court observes that the word "breach" is not mentioned in Count V of the complaint. Nor does Mr. Angel's prayer for relief request damages for Count V. See Compl.

32 (requesting "declaratory relief, and compensatory attorneys' fees for benefits conferred under Count[] . . . V"). Defendant acknowledges that this claim, although founded on an implied-in-fact contract, does not explicitly allege a breach of contract or that breach damages are owed to Mr. Angel, and comments that "the legal theory Mr. Angel pursues is unclear." Def.'s Mot. 21. Defendant argues, however, that any breach claim inherent in Count V would have "accrued no later than early 2013," and that Count V is therefore untimely. Id. at 22.

Count V can be read in two contradictory ways. Perhaps Mr. Angel intends the claim to be based on his oft-repeated legal conclusion that the United States breached its implied-in-fact contract with the shareholders every quarter since early 2013, which is how defendant reads this count of the complaint. Perhaps, however, Mr. Angel presents in Count V a stand-alone claim, unrelated to any breach of contract, requesting a judicial interpretation of an alleged "federal government guaranty of timely payment." Compl. 30-31. The court's timeliness analysis necessarily pursues two lines of inquiry, one for the timeliness of a claim for declaratory relief that is a breach-related claim, like the claim in Count I, and the other for a claim for declaratory relief that is unrelated to any contract breach.

### a. Declaratory Relief Regarding a Breached Contract

The claim in Count V shares with the claim in Count I an underlying factual predicate: that an implied-in-fact contract was formed between the United States and Mr. Angel, whereby the United States offered a guarantee that dividends would continue to be paid to the Enterprises' shareholders. As defendant notes, "Count V appears to merely seek declaratory relief based on the same theory stated in Count I." Def.'s Mot. 19. Indeed, there may be no meaningful distinction between the quarterly breach claim in Count I, which seeks, at bottom, relief related to the nonpayment of dividends, and the request for a declaration regarding Treasury's "legal obligations" in Count V, Compl. 31, other than in the type of relief requested. Cf. id. ¶ 99 (stating that "the words and conduct of Government officials manifested a government commitment to guarantee the dividend rights of Junior Preferred to induce financial institutions and others to buy Junior Preferred").

Mr. Angel's narrative in the complaint links a number of contractual obligations to the government's alleged implicit guaranty of dividends:

Fannie/Freddie Junior Preferred [certificates of determination] are contracts, creating contract rights in Plaintiff and contract obligations in Defendant, by reason of the terms thereof, and by reason of the Defendant's guaranty of timely payment of Junior Preferred share legal obligations, including but not limited to, (a) cumulative dividends payable at . . . specific payment dates, (b) legally declared dividends payable at board of directors ("BOD") specified payment dates, and (c) share principal face amounts payable at . . . Junior Preferred specified maturity, and mandatorily redeemable at conservatorship termination, in event of then uncured impairment.

Compl. ¶ 2 (emphasis removed).  It is apparent that Mr. Angel seeks in Count V to assert his alleged contract rights under the alleged implicit guaranty:  "Under general contract law principles, the Government's words and conduct created an offer to enter into a unilateral contract and the bargained for conduct by the Plaintiff in buying the Junior Preferred stock was an acceptance of that offer creating a binding unilateral contract."  Id. ¶ 101.  The court agrees with defendant that there is a breach of contract implied in Count V, even if there is not an explicit reference to a particular breach.  See id. ¶ 96 ("Plaintiff realleges every allegation in this Complaint as if fully set forth herein.").

To the extent that the declaratory relief claim in Count V seeks redress for the nonpayment of quarterly dividends, such a claim accrued, as defendant argues, in early 2013.  Mr. Angel does not specifically address the timeliness of the claim in Count V in his response brief.  If his general arguments pertaining to claim accrual, including his comments regarding the continuing claim doctrine and the last requisite facts or last acts test could be deemed to apply to Count V, those arguments have been rejected by the court in Section III.A.1, and must be rejected here as well.  To the extent that Count V is founded on quarterly breaches of Mr. Angel's dividend rights, this claim is untimely.

### b. Declaratory Relief Regarding a Contract Obligation Unrelated to a Breach

Notwithstanding the parallels between Count V and Count I, which include an underlying factual predicate that an implied-in-fact contract was formed between the United States and Mr. Angel, the claim in Count V may instead rely on some undeveloped legal theory that does not rely on a breach of contract.  Although the exact contours of the claim remain unclear, the alleged implicit guarantee by the United States is described as "a government commitment to guarantee the dividend rights of Junior Preferreds" and one that was created by the government's "offer to enter into a unilateral contract." Compl. ¶¶ 99, 101.  Mr. Angel does not provide any useful clarification of the claim in his response brief, where he merely states that the "federal government guaranty [is for the] timely payment of the [Enterprises'] Junior Preferred equity securities co-extensive, and on par with that of their debt securities legal obligations."  Pl.'s Resp. 1-2.

Defendant did not focus its timeliness analysis for Count V on this alternative interpretation of the claim as being unrelated to any contract breach.

### 2. Issue Preclusion

As in the court's inquiry into timeliness, the court's consideration of the applicability of the doctrine of issue preclusion to Count V must address two fundamentally contradictory interpretations of Count V.

### a. Declaratory Relief Regarding a Breached Contract

Defendant argues that the doctrine of issue preclusion is a bar to the claim in Count V, based on the court's rejection of the contract claim in former Count I, on limitations grounds, in

Angel I.  See Def.'s Mot. 19 ("Count V seeks declaratory relief but reiterates the contract law theory stated in Count I[;] [t]hus, like Count I, Count V is essentially identical in substance to Count I of the complaint that this Court previously dismissed.").  As stated above, the claim in Count V can be read to incorporate a breach claim, whereby Treasury allegedly breached an implicit guarantee of dividends, for which Mr. Angel seeks declaratory relief.  See supra Section III.E.1.a.

The court previously held that any breach claim brought by Mr. Angel that was founded on the nonpayment of dividends, or the failure to determine dividends on a quarterly basis, accrued no later than 2013.  Angel I, 165 Fed. Cl. at 463-66.  The court agrees with defendant that the accrual issue for Mr. Angel's breach claims has already been decided.  See supra Section III.A.2.  If Count V includes a breach claim related to Treasury's alleged implicit guaranty, the court considers whether the four conditions for the application of issue preclusion have been met for Count V.

There is no difference between the accrual of a breach claim in Count V here, and the accrual of the breach claim in Count I of the prior suit.  Because the accrual issue here is identical to the one decided in Angel I, claim accrual was litigated in the prior suit, accrual was essential to the final judgment dismissing all of the claims in the prior suit as untimely, and Mr. Angel had a full and fair opportunity to litigate claim accrual in the prior suit, all four issue preclusion conditions are met.  Any breach claim in Count V of the complaint must be dismissed as untimely pursuant to the doctrine of issue preclusion.

**b. Declaratory Relief Regarding a Contract Obligation Unrelated to a Breach of Contract**

If, however, Count V does not include a breach claim, the court's decision in Angel I that the former Count I was untimely is not preclusive of Count V in this suit.  Claim preclusion would not be appropriate, in other words, because the issue of the timeliness of Count V, if it is considered to be unrelated to any breach of contract, is not "identical to one decided in the first action."  Laguna Hermosa, 671 F.3d at 1288.

Defendant did not focus its issue preclusion analysis for Count V on this alternative interpretation of the count as being unrelated to any contract breach.

**3. Declaratory Relief in General**

Whatever the legal theory underlying Count V, defendant argues that Count V, like Count III, must be dismissed because claims for declaratory relief are beyond this court's jurisdiction.  See supra Section III.C.  Mr. Angel did not respond to this argument.  Because Count V, whatever its underlying legal theory, is a request for declaratory relief that is not subordinate to a money judgment, it is not within this court's subject-matter jurisdiction and must be dismissed.  James, 159 F.3d at 580.

**4. Implausibility**

The claim in Count V, whether or not it asserts a breach of contract, would also be dismissed under the plausibility standard, if it were within this court's jurisdiction, because the implied-in-fact contract upon which it is based is implausible. This topic was addressed at length when the court considered the plausibility of the breach claim in Count I. See supra Section III.A.3. The court need not regurgitate that analysis here. The allegation that the United States contracted with Mr. Angel to guarantee his dividends and other rights is not plausible, even with the addition of more public statements to the fact section of the current complaint than were present in the complaint considered in Angel I. In addition, an implicit guaranty by the United States that the shareholders of the Enterprises would receive dividends is especially implausible for a purchaser of shares like Mr. Angel, who purchased his shares after the Third Amendment began the net worth sweep. See supra Section I.D. Count V, which is entirely dependent on the premise that the United States offered the Enterprises' shareholders an implicit guaranty of dividends, is implausible and fails to state a claim upon which relief can be granted.

For all of the above reasons, the court dismisses Count V pursuant to RCFC 12(b)(1), or, in the alternative, under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

## IV.  CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed here, they are unpersuasive or unnecessary for resolving the issues currently before the court. The court **GRANTS** defendant's motion to dismiss. The court **DISMISSES** Counts I, II, and V of Mr. Angel's complaint for lack of subject-matter jurisdiction, **WITHOUT PREJUDICE**, or, in the alternative, under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The court **DISMISSES** Count III of Mr. Angel's complaint for lack of subject-matter jurisdiction, **WITHOUT PREJUDICE**. The court **DISMISSES** Count IV of Mr. Angel's complaint for failure to state a claim upon which relief can be granted, **WITH PREJUDICE**. The clerk shall enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge